**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| IARNACH TECHNOLOGIES LTD.,<br><br>                              Plaintiff,<br>v.<br><br>CHARTER COMMUNICATIONS, INC.,<br>CHARTER COMMUNICATIONS HOLDING<br>COMPANY, LLC, CHARTER<br>COMMUNICATIONS OPERATING, LLC,<br>SPECTRUM MANAGEMENT HOLDING<br>COMPANY, LLC, and SPECTRUM GULF<br>COAST, LLC,<br>                              Defendants. | Civil Action No. 2:24-cv-00230<br><br>**JURY TRIAL DEMAND** |

**<u>IARNACH'S OPPOSITION TO CHARTER'S MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   PROCEDURAL BACKGROUND.......................................................................... 1

III.  LEGAL STANDARDS ......................................................................................... 2

IV.   ARGUMENT ....................................................................................................... 5

    A.    Iarnach's Patents are Directed to Patent Eligible Subject Matter ..................... 5

       1.    The '035 Patent Passes Both *Alice* Steps ................................................. 5

       2.    The '982 Patent Passes Both *Alice* Steps ............................................... 12

       3.    The '378 Patent Passes Both *Alice* Steps ............................................... 18

    B.    Iarnach Pled Facts Showing Charter Willfully Infringes................................. 25

       1.    Pre-Suit Willfulness ............................................................................... 25

       2.    Post-Suit Willfulness .............................................................................. 27

    C.    To The Extent Necessary, Iarnach Should Be Granted Leave To Further Amend Its Complaint ..................................................................................................... 28

V.    CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121, 1128 (Fed. Cir. 2018) ........................................................................ 4, 14, 26

*Alarm.Com Inc. v. Vivint, Inc.*,
  No. 2:23-CV-00004-JRG-RSP, 2023 U.S. Dist. LEXIS 174396 (E.D. Tex. Sep. 6, 2023) 30, 31

*Alice Corp. Pty. v. CLS Bank Int'l*,
  134 S. Ct. 2347, 2355 (2014) ................................................................................... 3, 4, 13

*Ancora Techs. v. HTC Am., Inc.*,
  908 F.3d 1343, 1347-49 (Fed. Cir. 2018) ........................................................................ 10

*Ashcroft v. Iqbal*,
  556 U.S. 662, 678 (2009) ................................................................................................ 5

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
  827 F.3d 1341, 1350 (Fed. Cir. 2016) .............................................................................. 27

*Berkheimer v. HP Inc.*,
  881 F.3d 1360, 1368 (Fed. Cir. 2018) .................................................................. 4, 13, 14, 20

*Bowlby v. City of Aberdeen, Miss.*,
  681 F.3d 215, 219 (5th Cir. 2012) .................................................................................... 2

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496, 498 (5th Cir. 2000) .................................................................................... 5

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343, 1347-48 (Fed. Cir. 2014) .......................................................................... 4

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
  50 F.4th 127 (Fed. Cir. 2022) ....................................................................................... 28

*Correct Transmission, LLC v. Nokia of Am. Corp.*,
  No. 2:22-cv-00343-JRG-RSP, 2024 U.S. Dist. LEXIS 92770 (E.D. Tex. Mar. 21, 2024) ....... 30

*Cosmokey Sols. GMBH v. Duo Sec. LLC*,
  15 F.4th 1091 (Fed. Cir. 2021) ..................................................................................... 28

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999, 1011 (Fed. Cir. 2018) ............................................................................... 24

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245, 1257 (Fed. Cir. 2014) .............................................................................. 18

*E.g., Gree Inc. v. Supercell Oy*,
  No. 2:19-cv-00161-JRG-RSP, 2019 U.S. Dist. LEXIS 225935 (E.D. Tex. Dec. 6, 2019) ......... 5

*E.g., Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
  942 F.3d 1143, 1150-51 (Fed. Cir. 2019) .......................................................................... 10

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*,
  946 F.3d 1367, 1378 (Fed. Cir. 2020) .............................................................................. 32

*Enfish, LLC v. Microsoft Corp.*,

822 F.3d 1327, 1335 (Fed. Cir. 2016) ................................................................... 3, 10
*Erickson v. Pardus*,
    551 U.S. 89, 93 (2007) ................................................................................................ 6
*Finjan, Inc. v. Blue Coat System, Inc.*,
    879 F.3d 1299, 1305 (Fed. Cir. 2018) ...................................................................... 10
*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305, 329 (5th Cir. 2002) ............................................................................ 33
*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    136 S. Ct. 1923, 1933 (2016) ...................................................................................... 6
*Halo. Touchstream*,
    2024 U.S. Dist. LEXIS 45186 .................................................................................. 32
*Intellectual Ventures I, LLC v. Motorola Mobility LLC*,
    81 F. Supp. 3d 356 (D. Del. 2015) ............................................................. 12, 17, 18
*Intellectual Ventures II LLC v. JP Morgan Chase & Co.*,
    2015 U.S. Dist. LEXIS 56092 (S.D.N.Y. Apr. 28, 2015) ........................................ 25
*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
    594 F.3d 383, 387 (5th Cir. 2010) .............................................................................. 6
*Luminati Networks Ltd. v. Teso LT*,
    No. 2:19-CV-00395-JRG, 2021 U.S. Dist. LEXIS 28060 (E.D. Tex. Feb. 12, 2021) .............. 12
*Maxell, Ltd. v. Fandango Media, LLC*,
    2018 U.S. Dist. LEXIS 234452 (C.D. Cal. Mar. 21, 2018) ...................................... 25
*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299, 1314 (Fed. Cir. 2016) ................................................................... 3, 11
*MyMail, Ltd. v. ooVoo, LLC*,
    934 F.3d 1373, 1379 (Fed. Cir. 2019) ........................................................................ 3
*MyMail, Ltd. v. ooVoo, LLC*,
    No. 2020-1825, 2021 U.S. App. LEXIS 24764 (Fed. Cir. Aug. 19, 2021) ................ 18
*NXP USA, Inc. v. Mediatek USA Inc.*,
    No. 2:21-CV-00318-JRG, 2022 U.S. Dist. LEXIS 45815 (E.D. Tex. Mar. 15, 2022) ............. 32
*OpenTV, Inc. v. Apple, Inc.*,
    2016 U.S. Dist. LEXIS 10445 (N.D. Cal. Jan. 28, 2016) ........................................ 25
*Personalized Media Commc'ns, LLC v. Amazon.com, Inc.*,
    161 F. Supp. 3d 325 (D. Del. 2015) .......................................................................... 19
*SIPCO, LLC v. Emerson Elec. Co.*,
    939 F.3d 1301 (Fed. Cir. 2019) ................................................................................ 29
*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278, 1294-96 (Fed. Cir. 2020) ................................................................ 11
*Thales Visionix, Inc. v. U.S.*,
    850 F.3d 1343, 1348-49 (Fed. Cir. 2017) ................................................................ 22
*Tiare Tech., Inc. v. Dine Brands Glob., Inc.*,

No. 2:22-cv-00490-JRG-RSP, 2024 U.S. Dist. LEXIS 28023 (E.D. Tex. Jan. 11, 2024).......... 5

*Tiare Tech., Inc. v. Whataburger Rests., LLC,*
 No. 2:22-cv-0182-JRG-RSP, 2023 U.S. Dist. LEXIS 54813 (E.D. Tex. Mar. 15, 2023)........ 20

*Touchstream Techs., Inc. v. Altice USA, Inc.,*
 No. 2:23-cv-00060-JRG, 2024 U.S. Dist. LEXIS 45186 (E.D. Tex. Mar. 14, 2024) ............... 32

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.,*
 957 F.3d 1303, 1307 (Fed. Cir. 2020) ................................................................... 15, 16, 17, 19

*Visual Memory LLC v. NVIDIA Corp.,*
 867 F. 3d 1253,1259-60 (Fed. Cir. 2017)...................................................................... 9, 10, 25

**Statutes**

35 U.S.C. §101 ...................................................................................................................... 4, 12

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 2

Plaintiff Iarnach Technologies Ltd ("Iarnach") respectfully asks the Court to deny Defendants' Motion to Dismiss the Second Amended Complaint filed by Charter Communications, Inc., Charter Communications Holding Company, LLC, Charter Communications Operating, LLC, Spectrum Management Holding Company, LLC, and Spectrum Gulf Coast, LLC (collectively, "Charter"). Dkt. 47 ("Motion" or "Mot.").

## I.     INTRODUCTION

Iarnach's patents claim eligible subject matter. They provide technical solutions to complex problems rooted in technology that improve DPoE networks themselves. Further, the claims cover far more than conventional optical networks. Charter's Motion does not clearly and convincingly prove otherwise and fails both steps of the *Alice* test. At step one, Charter oversimplifies the claims by failing to account for the specific claim limitations. And at step two, Charter ignores the evidence in the complaint showing the claims are not directed to well-known optical network technology, which at minimum, raises factual disputes that must be resolved in Iarnach's favor at this early pleading stage.

Iarnach's complaint also presents a compelling case of willful infringement. Iarnach pled facts that, once credited and with all reasonable inferences drawn in Iarnach's favor, show Charter knew of the patents and that they covered Charter's DPoE networks well before this lawsuit. And under this Court's caselaw, there can be no dispute that Iarnach properly pled Charter's post-suit willfulness. Charter's Motion to Dismiss should be denied.

## II.     PROCEDURAL BACKGROUND

Iarnach's asserted patents cover optical networks implementing the DPoE v2.0 standard. Dkt. 43 (Second Amended Complaint, "SAC") at ¶¶58-61, 78-85, 102-107. Charter directly

infringes those patents by making, using, and selling DPoE v2.0 compliant optical networks. *Id.* at ¶¶41-46, 62, 86, 108.

Iarnach sued Charter for infringing two of its patents on April 5, 2024. Dkt. 1 (Initial Complaint). Three weeks later, Iarnach amended its complaint to include a third patent. Dkt. 24 (First Amended Complaint). Charter moved to dismiss that complaint on June 24, 2024, alleging *inter alia*, that all three patents failed to satisfy §101 and that Iarnach had not adequately pled willfulness. Dkt. 31 (1ˢᵗ MTD) at 16-29. While Iarnach disagreed that its complaint was inadequate, in an attempt to avoid a dispute, Iarnach further amended it to address Charter's objections. SAC.

To address the §101 issues, Iarnach's second amended complaint cited the patent specifications and prosecution histories to show how the asserted patents were not directed to conventional or well-known optical network technology, but rather were directed to technical solutions that improved the DPoE v2.0 networks themselves. SAC at ¶¶52-53, 72-73, 96-97. And to address the willfulness issues, Iarnach added an entire section providing specific dates upon which Charter learned of the patents (before the filing of the complaint) and that they covered DPoE v2.0 networks. *Id.* at ¶¶113-120. Notwithstanding, Charter filed this present Motion seeking to dismiss Iarnach's second amended complaint on July 15, 2024.

## III.    LEGAL STANDARDS

A party may move to dismiss an action for a "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court assumes all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). Patent eligibility under 35 U.S.C. §101 may be determined on a Rule 12 motion, but only when there are no factual

allegations that, if taken as true, prevent resolving the eligibility question as a matter of law. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019).

To determine whether claims contain patent-eligible subject matter, courts apply the *Alice* two-step framework. First, the court "determine[s] whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). To do so, the court looks to the claims' "character as a whole." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). While all claims embody abstract ideas and other ineligible subject matter at some level, the court's task is to examine "whether the claims [] focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

Second, if the challenged claims recite a patent-ineligible concept, the court then "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." *Alice*, 134 S. Ct. at 2355. This step is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014).

The Federal Circuit has explained that "[w]hile the ultimate determination of eligibility under §101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). For example, "[t]he question of whether a claim element or combination of elements is well-understood, routine and

conventional to a skilled artisan in the relevant field is a question of fact" that must be "proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Additionally, specific improvements described in a patent specification, "to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities." *Id.* at 1369.

Courts in this district routinely deny Rule 12 motions to dismiss on §101. *E.g.*, *Gree Inc. v. Supercell Oy*, No. 2:19-cv-00161-JRG-RSP, 2019 U.S. Dist. LEXIS 225935, at *1 (E.D. Tex. Dec. 6, 2019) (denying motion because Defendant did "not meet its Rule 12(b)(6) burden of showing the patents are invalid under 35 U.S.C. §101"); *Tiare Tech., Inc. v. Dine Brands Glob., Inc.*, No. 2:22-cv-00490-JRG-RSP, 2024 U.S. Dist. LEXIS 28023 (E.D. Tex. Jan. 11, 2024) (denying motion because claims passed both *Alice* steps).

Courts may also consider willfulness allegations as part of a Rule 12 motion, although such a motion is "viewed with disfavor and is rarely granted.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). That is because "[t]he complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Id.* A plaintiff meets its pleading burden when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the ground upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (alteration in original).

To allege willful patent infringement, the plaintiff must plausibly allege the "subjective willfulness of a patent infringer, intentional or knowing." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1933 (2016). This requires a plaintiff to allege facts plausibly

showing that the accused infringer knew of the patents and knew or should have known that it infringed. *Id.* In resolving a motion to dismiss, "[t]he court's task is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## IV.    ARGUMENT

In its second amended complaint, Iarnach asserts three patents that pass the *Alice* test for subject matter eligibility. *See infra* at §IV(A). Iarnach also satisfies the notice pleading requirements for alleging willful infringement. *Id.* at §IV(B).

### A.    Iarnach's Patents are Directed to Patent Eligible Subject Matter

#### 1.    The '035 Patent Passes Both *Alice* Steps

##### a.    *Alice step 1*

The '035 Patent is intimately tied to technological improvements in particular optical networks known as "DPoE" networks. Dkt. 43-2 (hereinafter, '035) at 1:19-46. These optical networks are not abstract concepts. The '035 Patent explains that DPoE networks begin as passive optical networks, where an "OLT" Optical Line Terminal located at a central office employs an optical splitter to send pulses of light to "ONU" Optical Network Units located at customer premises. *Id.* However, DPoE networks further include: (1) "a point to point (P2P) Emulation Sublayer to [make the] network appear as a collection of P2P links to higher protocol layers;" and (2) a "DOCSIS Mediation Layer (DML) solution to provide the translation between the DOCSIS back-office systems for provisioning of DOCSIS services." *Id.*

Figure 2 depicts a DPoE network[1]:



*Id.* at Fig. 2.

The '035 Patent improves DPoE networks by providing a novel technical solution to the problem of DPoE network reconfiguration. '035 at 2:41-46. At a high level, the '035 Patent allows reconfiguration without restarting and re-registering the ONU device. Prior to the '035 Patent, "in case of any changes to the DPoE ONU, service etc. configuration, the device ha[d] to be rebooted (power cycled) to go through the process of discovery and registration once again in order to restart the vCM [virtual cable modem] and download the updated CM config file with new service-related parameters." *Id.* at 3:48-52. The '035 Patent teaches this "reboot process is disruptive to services and, when used to upgrade any of the existing and live services, can adversely affect services provisioned on the given DPoE ONU." *Id.* at 3:54-56. The '035 Patent solves this problem via a "seamless update of DPoE ONU configuration in DPoE Networks without the need to reboot of the DPoE ONU (D-ONU), once the DPoE ONU has been provisioned with the initial configuration

---

[1] DPoE networks are also explained with more detail in Iarnach's complaint. SAC at ¶¶33-40.

file and remains in the operating state." *Id.* at 4:5-9. Accordingly, "the ONU configuration parameters [] may be changed without affecting other live services operating simultaneously on the ONU." *Id.* at 4:10-13. The '035 Patent's seamless reconfiguration approach provides important technical benefits to DPoE networks, including "introduc[ing] changes to the service and device configuration on the fly" that are not disruptive and do not adversely affect provisioned services. *Id.* at 4:45-50; *see also id.* at 3:54-57. "This guarantees tighter control over what devices are connected to the network and what services are provisioned on specific devices." *Id.* at 3:62-65.

The '035 Patent's seamless DPoE network reconfiguration is reflected in the patent claims. The claim that Charter attacks, '035 claim 14, recites a method of seamlessly updating the configuration of an ONU in a DPoE network. The method is seamless because the operating ONU reconfigures itself without rebooting by only altering the particular aspects that changed, as determined by comparing the ONU's existing configuration file to an updated configuration file:

> 14. A method of updating configuration of an Optical Network Unit (ONU) in an Ethernet Passive Optical Network (EPON), the method comprising:
>
> [a] receiving a notification that an updated configuration file is available for the ONU, wherein the ONU is configured with a current configuration file;
>
> [b] obtaining the updated configuration file;
>
> [c] performing, using at least one computer, a first validation of the updated configuration file for structural errors;
>
> [d] determining changes between the current configuration file of the ONU and the updated configuration file to identify ONU resources to implement to the changes;
>
> [e] performing a second validation about whether the ONU resources to implement the changes are available or not at the ONU; and
>
> [f] applying the changes to the ONU when it is determined that the ONU resources to implement the changes are available at the ONU.

'035 at 11:47-64. This claim relates to an improved DPoE network where an operating ONU configured according to a current configuration file [a] receives a notification that an updated configuration file is available and then [b] obtains it. *Id.* at 11:47-53, 5:32-60. Thereafter, [c] the

ONU validates the updated configuration file to ensure it has no structural errors. *Id.* at 11:54-55, 6:1-15. Next, [d] the ONU determines the changes between the current and updated configuration files so that it can identify the ONU resources that will be used to implement the changes. *Id.* at 11:56-58, 6:16-28. Then, [e] the ONU performs another validation to ascertain whether the ONU resources needed to implement the changes are available. *Id.* at 11:59-61, 6:35-48. Finally, [f] if the ONU determines that it has the resources to implement the changes, the ONU applies the changes to seamlessly reconfigure itself. *Id.* at 11:62-64, 6:58-7:7.

Claim 14 is not directed to an abstract idea. Rather, it is directed to a concrete solution to a technical problem: a DPoE network that can be seamlessly reconfigured by performing specific steps. The Federal Circuit has found that such a claim passes *Alice* step one. For example, in *Visual Memory LLC v. NVIDIA Corp.*, the court held the claim's focus on a specific improvement in computer capabilities (instead of merely using a computer as a tool to invoke a mathematical formula) meant the claim was not merely directed to an abstract idea.[2] 867 F.3d 1253, 1259-60 (Fed. Cir. 2017). The court also found it important that the specification discussed the advantages offered by the technological improvement. *Id.* Much like the *Visual Memory* claim, '035 claim 14 focuses on a specific improvement in network capabilities that improves the functioning of the DPoE network itself (seamless reconfiguration), and the specification details the benefits of that improvement ('035 at 3:54-57, 3:62-65, 4:45-50). Thus, '035 claim 14 passes *Alice* step one, and

---

[2] The Federal Circuit has applied the same reasoning to find that similar claims survived *Alice* step one. *E.g.*, *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150-51 (Fed. Cir. 2019) (claims were patent-eligible "because they were directed to a non-abstract improvement in an existing technological process"); *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1347-49 (Fed. Cir. 2018) (claim directed to an improvement in computer functionality passes muster under *Alice* step one); *Finjan, Inc. v. Blue Coat System, Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018); *Enfish*, 822 F.3d at 1337.

the inquiry stops. *Enfish*, 822 F.3d at 1339 ("Because the claims are not directed to an abstract idea under step one of the *Alice* analysis, we do not need to proceed to step two of that analysis.").

In its attempt to portray the claims as abstract, Charter has broadly overgeneralized the '035 claims and removed key limitations. In characterizing them as nothing more than "distributing software updates over a network" (Mot. at 3, 5), Charter violates the Federal Circuit's mandate to "avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO*, 837 F.3d at 1313; *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294-96 (Fed. Cir. 2020) (rejecting claim characterization that "disregard[ed] elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements"). For example, Charter disregards that the '035 claims recite reconfiguring a particular ONU component of an EPON optical network. *E.g.*, '035 claim 14 ("A method of updating configuration of an Optical Network Unit (ONU) in an Ethernet Passive Optical Network (EPON)"). Similarly, Charter omits key steps from the claims that go far beyond merely distributing software updates over a network, including: (1) "receiving a notification that an updated configuration file is available for the ONU" ('035 at 11:50-51); (2) "determining changes between the current configuration file of the ONU and the updated configuration file to identify ONU resources to implement the changes (*id.* at 11:56-58); and (3) "performing a second validation about whether the ONU resources to implement the changes are available or not at the ONU" (*id.* at 11:59-61). The specification amply describes these key steps, which in combination provide necessary operations to perform seamless reconfiguration. *Id.* at 5:41-55, 6:16-48. And during prosecution, the Applicant distinguished the prior art using these same key steps, clearly indicating they are not conventional. Ex. A ('035 FH) at IARNACH-CHTR_761-767, 779. By ignoring the seamless optical network reconfiguration nature of the

9

claim, the specific optical network components involved, and key steps from the claims, Charter puts forward an *Alice* step 1 analysis that is deeply flawed.

Charter's primary case is readily distinguishable. *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356 (D. Del. 2015). In that case, the claim simply required a user at a computer to select particular software updates from a directory of available software updates and, in response, the computer received the selected software updates. *Id.* at 364. The court noted that each step of the claim could be performed by a human without a computer. *Id.* at 365. Here, the '035 claims are very different from the *Motorola Mobility* claims because they provide a detailed, multi-step solution to the technical problem of seamlessly reconfiguring an ONU within a DPoE optical network. *E.g.*, '035 at claim 14. They go far beyond merely performing an abstract idea on a computer; they describe specific steps rooted in DPoE network technology that cannot be performed solely by a human. *Id.*

Further, despite having the burden to do so, Charter does not sufficiently address the eligibility of each '035 claim or make a showing that claim 14 is representative of all the '035 claims. *See Luminati Networks Ltd. v. Teso LT*, No. 2:19-CV-00395-JRG, 2021 U.S. Dist. LEXIS 28060, at *7 (E.D. Tex. Feb. 12, 2021). Instead, Charter's Motion focuses only on '035 claim 14 and glosses over the other thirty-one claims from the '035 Patent in about a page, summarily concluding that each is directed to an abstract idea. Mot. at 8-9. That is clearly insufficient. For example, claims 13 and 32 are means-plus-function, which are construed by law to include the particular structures from the specification. 35 U.S.C. §112(f). Yet Charter does not explain how the corresponding structures from the '035 specification—*e.g.*, the "dpoeVcmDynCfgNow MIB object" used to perform the step of notifying the ONU of an updated configuration file ('035 at 5:41-45)—are abstract. Mot. at 8. Because they are not. And Charter's only evidence that claim

10

14 is representative of all the other '035 claims is a single statement (since deleted) from Iarnach's prior, non-operative complaints. Mot. at 4-5. But Iarnach never admitted in those earlier complaints that claim 14 was representative of all the other '035 claims for purposes of §101—only that the infringement case relative to claim 14 exemplified Charter's infringement of other claims. Dkt. 24 (First Amended Complaint) at 22. So, at minimum, the Court must deny Charter's motion as to '035 claims 1-13 and 15-32.

b.    <em>Alice step 2</em>

Assuming for the sake of argument that the '035 claims are directed to an abstract idea, they are still patent eligible under *Alice* step two because the claim elements both individually and as an ordered combination transform the nature of the claim into a patent eligible application. *Alice*, 573 U.S. at 217. This is because they require more than just "well-understood, routine, and conventional activities." *Berkheimer*, 881 F.3d at 1367.

Iarnach's complaint specifically pleads: "The '035 is not directed to conventional or well-known optical network technology. Rather, the '035 Patent improves existing optical networks that did not provide seamless dynamic [re]configuration." SAC at ¶72. For support, the complaint cites three paragraphs from the '035 specification explaining how the '035 Patent's seamless reconfiguration approach improves on conventional DPoE networks where "a change in the configuration of the Cable Modem (CM) device involves a reboot of the CM device [that] is disruptive to the service provided." *Id.* (citing '035 at 4:4-50); '035 at 3:19-26.

Iarnach's complaint further pleads: "The prosecution history of the ['035 Patent] further indicates that it differs from convention networks. For example, the Applicant explained that the prior art did not 'notify[] a virtual cable modem (vCM) prior to successful update of the ONU, that the updated configuration file is available for the ONU.'" SAC at ¶73 (citing Ex. A ('035 FH) at IARNACH-CHTR_803-4 (underlining in original)). And the complaint further notes how the

11

Examiner agreed in the Notice of Allowance that the '035 claimed networks were not conventional. *Id.* (citing Ex. A ('035 FH) at IARNACH-CHTR_814).[3]

Charter disagrees with the above and alleges the '035 claims only "rely on conventional computing functionality in conventional networks using conventional devices." Mot. at 13. But that merely highlights a fact dispute that defeats Charter's motion. The Federal Circuit has expressly stated: "'[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6).'" *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318-19 (Fed. Cir. 2019) (quoting *Aatrix*, 882 F.3d at 1126-27). This Court must not "err[] by ignoring the principle, implicit in *Berkheimer* and explicit in *Aatrix*, that factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101." *Id.* Once Iarnach's pleaded allegations are accepted as true, this Court "cannot conclude that the asserted claims lack an inventive concept" at this pleadings stage. *Id.* So Charter's Motion fails at *Alice* step two.[4]

2.    The '982 Patent Passes Both *Alice* Steps

a.    *Alice step 1*

The '982 Patent is eligible under *Alice* step one because it is "directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020). Specifically, like the '035 Patent, it focuses on an

---

[3] The prosecution history also shows how other '035 claim features were used to distinguish conventional networks, including: "determining changes between the current configuration file of the ONU and the updated configuration file to identify ONU resources to implement the changes" and "performing a second validation about whether the ONU resources to implement the changes are available or not at the ONU." Ex. A ('035 FH) at IARNACH-CHTR_761-767, 779.

[4] Charter only cursorily discusses the thirty-one other '035 claims besides claim 14. Mot. at 12 & fn. 4. This provides another independent basis for denying Charter's Motion as to '035 claims 1-13 and 15-32.

improvement to DPoE networks. *See* Dkt. 43-6 (hereinafter, '982) at 1:7-26, 8:33-34. In a DPoE network, initialization of an ONU requires configuring two network components: the OLT and the ONU itself. *See id.* at 1:24-25, 1:36-37, 1:57-60. At the time of the invention, the ONU was configured by downloading a configuration file. *See id.* at 1:43-53. The OLT could be configured only after completion of the ONU configuration, and the OLT was configured generally "by hand individually, or performed through a command line, or performed through a simple network management protocol (SNMP) interface between an Element Management System (EMS) and the OLT." *Id.* at 1:61-64. This approach had "low configuration efficiency," especially when "more complex configurations need to be performed on the OLT." *Id.* at 2:43-46. For example, the patent describes "the normal opening of Ethernet Virtual Private LAN (EVP-LAN) services," which requires "numerous" and "complex" configurations for the OLT. *See id.* at 2:3-41.

The '982 Patent solves the low configuration efficiency problem by providing a novel way of configuring a DPoE system that implements a new type of configuration file and algorithm. For example, claim 1 recites a specific step-by-step "service auto-configuration method of a DOCSIS Provisioning Of EPON (DPOE) system" that is performed "in a process of ONU initialization." '982 at 8:33-34, 8:50-51. The system must acquire a configuration file that includes configuration information for both an ONU and OLT. *See id.* at 8:35-40. The system must also analyze that file, obtain the configuration information, and convert that information into identifiable message formats. *See id.* 8:41-44, 8:52-57. The system is also required to configure the OLT locally and to simultaneously configure the ONU via a management channel between the OLT and ONU. *See id.* 8:45-49. As the '982 Patent explains, "complet[ing] the automatic configuration of the OLT and the ONU at the same time through a configuration file including the configuration information of

the ONU and the configuration information of the OLT" can "improve the configuration efficiency of the whole system very well." *Id.* at 8:21–31.

The Federal Circuit's analysis in *Uniloc* is instructive. There, the patent was directed to a communication system comprising a primary station and at least one secondary station. *See Uniloc*, 957 F.3d at 1305. In conventional systems, primary stations would "alternate between sending inquiry messages to identify new secondary stations and polling secondary stations already connected . . . to determine whether they have information to transmit." *Id.* This conventional approach could result in a secondary station experiencing "delays of tens of seconds." *Id.* The patent improved the conventional systems "by including a data field for polling as part of the inquiry message, thereby allowing primary stations to send inquiry messages and conduct polling simultaneously." *Id.* The court held that "the claims at issue are directed to a patent-eligible improvement to computer functionality" because the "additional data field" was a "change in the manner of transmitting data" and enabled "eliminat[ing] or reduc[ing] the delay present in conventional systems where the primary station alternates between polling and sending inquiry messages." *Id*. at 1307-08.

Here, conventional DPoE systems would only configure the OLT after completion of the ONU configuration. This approach was inefficient and led to delays, especially when complex configurations were required. The '982 Patent improves the conventional systems by including configuration information for an OLT as part of the configuration file, thereby allowing the system to "complete the automatic configuration of the OLT and the ONU at the same time." '982 Patent at 8:21-22. Just as in *Uniloc*, this change in the manner of transmitting data increases efficiency and reduces delay. Accordingly, the '982 Patent is directed to an improvement to DPoE networks—not an abstract idea.

14

Charter's arguments under step one are incorrect. As an initial matter, Charter's allegation that the '982 Patent is "directed to the abstract idea of distributing software updates over a network" is wrong because the patent never mentions "updates." Indeed, Claim 1 explicitly states that "the method is performed in a process of ONU *initialization*." '982 at 8:50-51 (emphasis added).

Chartier relies heavily on the *Motorola Mobility* case. But that case was decided before the Federal Circuit's opinion in *Uniloc*, which is discussed above. Moreover, the claim in *Motorola Mobility* could be performed by a human without a computer, and there is no such allegation here. *See Motorola Mobility*, 81 F. Supp. 3d at 365. Instead, the claimed invention here is "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Further, the claim in *Motorola Mobility* also provided "no description of the underlying programming," while the '982 Patent provides details regarding the contents of the "configuration file" and specifies that the ONU is configured via a management channel between the OLT and ONU. *Compare Motorola Mobility*, 81 F. Supp. 3d at 366 ("no description") *with* '982 at 8:36–40 ("the configuration file comprises both configuration information of an optical network unit (ONU) and configuration information of an optical line terminal (OLT) in the DPOE system").

Charter's reliance on *MyMail, Ltd. v. ooVoo, LLC* is similarly misplaced. No. 2020-1825, 2021 U.S. App. LEXIS 24764 (Fed. Cir. Aug. 19, 2021). Unlike the '982 Patent, the written descriptions in *MyMail* provided "no support for [the patentee's] purported improvement in computer functionality." *Id.* at *15. Here, the '982 Patent specifically explains that "complet[ing] the automatic configuration of the OLT and the ONU at the same time through a configuration file

including the configuration information of the ONU and the configuration information of the OLT" can "improve the configuration efficiency of the whole system very well." '982 at 8:21–31.

Charter also cites another pre-*Uniloc* district court case, *Personalized Media Commc'ns, LLC v. Amazon.com, Inc.*, 161 F. Supp. 3d 325 (D. Del. 2015). But the claims there were essentially "no different from checking to see if a copy of the Federal Rules is up to date, and, if it is not, replacing it with a new one." *Id*. at 332. Such "generic" claims preempted all methods of updating operating instructions remotely. *See id*. Here, because of the specific data structures and interactions required in the '982 Patent, none of the claims preempt all types and all forms of "distributing software updates over a network." Mot. at 5. Indeed, one could perform Charter's alleged abstract idea without acquiring the claimed "configuration file," configuring an ONU via a management channel between an OLT and the ONU, or other claimed features. Charter's alleged abstract idea could also be performed in contexts other than the ONU initialization process in a DPoE system.

Similar to its '035 argument, Charter fails to show that Claim 1 is representative of all the '982 claims. For example, regarding the dependent claims, Charter provides only a one-sentence conclusory assertion that those claims "add token steps or conventional computer and networking components to carry out the abstract idea of distributing software updates over a network." Mot. at 9. This is insufficient to meet its burden of "conduct[ing] an analysis tethered to the claim language, to show that there are no legally relevant distinctions between the claim identified as representative and the remaining asserted claims." *Tiare Tech., Inc. v. Whataburger Rests., LLC,* No. 2:22-cv-0182-JRG-RSP, 2023 U.S. Dist. LEXIS 54813, at *5 (E.D. Tex. Mar. 15, 2023). And as with the '035 Patent, Charter improperly relies on a single statement (since deleted) from

Iarnach's prior, non-operative complaints regarding representativeness for the purposes of infringement. Mot. at 4-5. Therefore, the Court should deny Charter's motion on this basis as well.

> b.    *Alice step 2*

The '982 Patent is also eligible under *Alice* step two. "The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367. "[W]hether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Id.* at 1368.

Charter has failed to prove by clear and convincing evidence that the way of configuring DPoE systems provided by the '982 Patent was conventional. Contrary to Charter's assertions, Iarnach's complaint explains that "[t]he '982 Patent is not directed to conventional or well-known optical network technology." SAC at ¶96. The complaint cites a paragraph from the specification discussing how the invention "can improve the configuration efficiency of the whole system very well" when "compared with the related art." *Id.*

The complaint then explains that "[t]he prosecution history of the '982 Patent further indicates that it differs from conventional networks." SAC at ¶97. For example, the Examiner agreed that when analyzing the acquired configuration file, the prior art DPoE system did not "convert the configuration information of the ONU into a message format which can be identified by the ONU, and convert the configuration information of the OLT into a message format which can be identified by the OLT." *Id.* (citing Ex. B ('982 FH) at IARNACH-CHTR-336, 340, 349).

The '982 Patent also provides an inventive concept through its ordered combination of claim limitations. As noted earlier, in conventional systems, the ONU and OLT were configured in a separate, sequential fashion. The '982 Patent teaches configuring these components in a

simultaneous and unconventional manner that reduces the time required to perform system configuration. For example, Claim 1 requires the DPoE system to "configure[e] the OLT locally according to the configuration information of the OLT and meanwhile configuring the ONU according to the configuration information of the ONU." '982 at 8:45-48.

Charter incorrectly contends that "[t]he ordered combination of the claims adds nothing technological because the steps are performed in the logical and necessary order." Mot. at 11. But if the '982 Patent's simultaneous configurations were truly "necessary," then prior art DPoE systems with sequential configurations would have been inoperable. This was not the case. The '982 Patent developed a technique to allow these configurations to occur in overlapping fashion, which was not conventional.

Charter also incorrectly alleges that the '982 Patent relies "on conventional computing functionality in conventional networks using conventional devices." Mot. at 13. At best, Charter's arguments raise a factual dispute. And, as discussed regarding the '035 Patent, once Iarnach's pleaded allegations are accepted as true, this Court "cannot conclude that the asserted claims lack an inventive concept" at this pleadings stage. *Cellspin*, 927 F.3d at 1318.

### 3. The '378 Patent Passes Both *Alice* Steps

#### a. *Alice step 1*

The '378 Patent is titled "Method and Device for Encrypting **Multicast Service** in Passive Optical Network System." Dkt. 43-1 (hereinafter, '378) at Title. The first line of the Abstract describes the invention as "a method for encrypting multicast services." *Id.* at Abstract. The specification explains that it "solve[s] the above technical problem" by employing multicast encryption in a PON system. *Id.* at 1:63-65. Every claim requires multicast encryption. *Id.* at 7:61-10:19. During prosecution, the examiner noted that the '378 Patent disclosed a novel way to implement multicast encryption. Ex. C ('378 FH) at IARNACH-CHTR_2430-1. Yet Charter

18

characterizes the purported abstract idea in a way that ignores "multicast" entirely. When the '378 Patent is considered in its entirety, the claims are not directed to an abstract idea. *See Thales Visionix, Inc. v. U.S.*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017) (reversing the Claims Court for ignoring the intrinsic record and characterizing the "abstract idea" too narrowly).

Charter contends the '378 Patent is directed to the abstract idea of "creating, using, and sending a standard encryption key and data over a network." Mot. at 13. This fundamentally mischaracterizes the nature of the '378 Patent. The patent is not directed to encrypting data; it is directed to **what** data is encrypted and **how** that data is encrypted.

Multicast transmissions, unlike unicast transmissions, send the same data or content to different users at substantially the same time. The '378 specification explains that prior art systems used unicast encryption mechanisms for both unicast and multicast data. *See* '378 at 1:32-39. For multicast data, there was no effective encryption mechanism. *Id*. at 1:39-43. Instead, network operators would establish a single encryption key to use for encryption across the entire network. *Id*. at 1:43-44. The problem with this solution is that once the encryption key is stolen, all service content in the network can be decrypted and stolen by a malicious user. *Id.* at 1:43-47. Alternatively, some network operators would send a duplicate encryption key to each ONU intended to receive multicast data. *Id*. at 48-53. The disadvantage to this approach is the need to send duplicate versions of the same encryption key to numerous devices. *Id*. at 1:53-54.

The '378 Patent solves these problems with a novel way to implement multicast encryption. In the '378 Patent, the OLT generates an encryption key that is used to encrypt multicast data within the same bearer channel. '378 at 1:66-2:3. Rather than using a single key across an entire PON or duplicating the key across every ONU, the '378 Patent discloses limiting the key's disclosure to a single bearer channel. As the specification explains, the patented invention has

19

several improvements over the prior art. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1369-70 (Fed. Cir. 2020) (specification's identification of the advantages of the claimed invention supports the conclusion that the invention is not directed to an abstract idea). First, it "reduces the complexities of the OLT encryption mechanism and the ONU decryption mechanism." '378 at 3:9-13. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018) (system that reduced the number of steps to perform the same method not directed to an abstract idea). Second, it improves security by limiting the range of devices that receive the encryption key. *Id.* at 3:13-17. Third, it prevents malicious users from acquiring the encryption key because the key is only transmitted after a user has been activated successfully. *Id.* at 3:19-26.

As is clear from the specification, the concept of implementing "multicast" encryption is fundamental to the '378 Patent, and it was error for Charter to exclude it from its purported abstract idea. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018) ("[The step one] inquiry requires that the claims be read as a whole"). This carries over to the claims as well. Claim 1, which Charter contends is representative of the patent, requires "using the common key to ***encrypt multicast service data*** of ***all different multicast services in a same bearer channel*** and then sending encrypted data, wherein the ***multicast service data of all different multicast services in the same one bearer channel*** use a same common key to carry out encryption." Once again, the claims do not simply require encryption; the claims require a specific type of multicast encryption to be used for "all different multicast services in a same bearer channel." This goes well beyond simply "creating, using, and sending a standard encryption key and data over a network." The claims require a specific type of encryption (multicast) and a specific category of recipients (devices in the same bearer channel).

The prosecution history further illuminates Charter's mischaracterization of the '378 Patent. In the Notice of Allowance, the examiner highlighted using multicast encryption to encrypt data in the same bearer channel as novel over the prior art. *See* Ex. C ('378 FH) at IARNACH-CHTR_2430-1 ("None of the prior art of record alone or in combination teaches using the common key to encrypt multicast service data of all different multicast services in a same bearer channel and then sending encrypted data, wherein the multicast service data of all different multicast services in the same one bearer channel use a same common key to carry out encryption."). Charter's abstract idea, which excludes these concepts, cannot be correct.

The improvements provided by the '378 Patent are similar to improvements the Federal Circuit has said are not directed to an abstract idea. For example, the '378 specification teaches that the invention eliminates the need to duplicate the encryption key across multiple ONUs. In *Visual Memory*, the court held that a system that eliminated the need for every processor to have its own memory system was not directed to an abstract idea. *See Visual Memory*, 867 F.3d at 1259.

Charter cites district court cases with purportedly analogous claims, but those cases are only analogous if the "multicast" and "same bearer channel" components of the '378 Patent are ignored. First, Charter cites *Maxell, Ltd. v. Fandango Media, LLC*, 2018 U.S. Dist. LEXIS 234452 (C.D. Cal. Mar. 21, 2018). The *Maxell* claims required sending a key to each authorized user. *Id*. at *24-25, *28. In other words, the claims covered the abstract idea of sending an encryption key, not the specific multicast encryption in a single bearer channel claimed in the '378 Patent.

Next, Charter cites *OpenTV, Inc. v. Apple, Inc.*, 2016 U.S. Dist. LEXIS 10445 (N.D. Cal. Jan. 28, 2016). The *OpenTV* patent Charter cites as comparable is directed to "a user's ability to make a purchase online with the use of a credit card transaction application." *Id*. at *3. The claims say nothing about multicast encryption. Finally, Charter cites *Intellectual Ventures II LLC v. JP*

*Morgan Chase & Co.*, 2015 U.S. Dist. LEXIS 56092 (S.D.N.Y. Apr. 28, 2015). In that case, the disputed patent contains broad limitations such as "protecting portions of the data" and implementing "rules defining access rights to the data as enforced by an access mechanism." *Id.* at *9. Conversely, the '378 contains specific, concrete limitations directed towards a specific type of encryption in a specific environment.

Charter contends claim 1 is representative of all claims for the purposes of step one because "the asserted dependent claims of the 378 patent merely add token steps and use conventional computer and networking components." Mot. at 15. But the dependent claims add meaningful distinctions that further distance the '378 Patent from Charter's purported abstract idea. For example, claims 3 and 5 add the concept of regenerating the encryption key after the expiration of an aging time. This improves the overall network security of the system by regularly requiring a new encryption key to decrypt the multicast service data. *See* '378 at 3:61-4:3. Claims 4, 6, and 8 add the requirement that a successfully activated ONU applies to receive multicast service data. In claims 4 and 8, the OLT sends the ONU a bearer channel identification after successful activation. Both requirements help ensure that only intended recipients can decrypt the multicast service data. *See id.* at 3:19-26.

b.    *Alice step 2*

Even if the Court finds that the '378 Patent is directed to an abstract idea, the claims contain an inventive concept that makes them patentable under step two. Whether or not a claim contains an inventive concept is a question of fact. *See Aatrix*, 882 F.3d at 1128. Here, both the specification and the complaint (SAC at ¶¶52-53) allege that the '378 Patent is directed at a technical solution

to a technical problem. Charter cannot overcome those allegations, especially at the pleadings stage.

As explained above when describing step one, the '378 Patent provides a technical solution to a technical problem. Prior art PON systems used one of two encryption methods, both of which had flaws. First, network operators would establish a single encryption key to use for encryption across the entire network. '378 at 1:43-44. The problem with this solution is that once the encryption key is stolen, all service content in the network can be decrypted and stolen by a malicious user. *Id*. at 1:43-47. Alternatively, some network operators would a duplicate encryption key to each ONU intended to receive the multicast data. *Id*. at 48-53. The disadvantage to this approach is the need to send duplicate versions of the same encryption key to numerous devices. *Id*. at 1:53-54.

The '378 Patent solves these problems with a novel way to implement multicast encryption. In the '378 Patent, the OLT generates an encryption key that is used to encrypt multicast data within the same bearer channel. '378 at 1:66-2:3. Rather than using a single key across an entire PON or duplicating the key across every ONU, the '378 Patent discloses limiting the key's disclosure to a single bearer channel. As explained above, the specification describes several improvements over the prior art PON systems, including reducing the complexity of the OLT encryption and ONU decryption, improved security by limiting distribution of the encryption key, and limiting malicious users from acquiring the encryption key.

Charter argues the '378 Patent does not recite an inventive concept because "the specification concedes that the PON, as well as the ONU and OLT devices, recited in the claims were already routine by the earliest priority date." *See* Mot. at 16 (citing '378 at 1:14-47). Tellingly, Charter cites the '378 Patent's **description of the prior art** and cuts off its citation before the

specification begins describing "the technical problem to be solved by the present invention." *See* '378 at 1:58-62. Further, Charter's argument ignores the holding of the Federal Circuit's seminal "step two" case—a novel arrangement of known components can be an inventive concept. *See BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *Cellspin*, 927 F.3d at 1318 ("Implementing a well-known technique with particular devices in a specific combination … can be inventive.").

The '378 specification does not allege to have invented a PON, an OLT, or an ONU. Instead, the '378 Patent claims a novel way to implement multicast encryption in a PON, using OLTs and ONUs. *See* '378 at 1:58-62 ("The technical problem to be solved by the present invention is to provide a method and device for encrypting multicast service in a passive optical network (PON) system to increase the security and reduce the complexity of OLT encryption mechanism and the burden of the OLT."). As explained above, the invention "reduces the complexities of the OLT encryption mechanism and the ONU decryption mechanism," as well as "improve[s] the security of the multicast service content." *Id*. at 3:9-17.

The '378 Patent is very similar to inventions found to be inventive concepts. For example, in *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127 (Fed. Cir. 2022), the court held that a content distribution method was an inventive concept because it reduced costs and improved system performance. *Id*. at 133. The '378 Patent reduces the complexity of both the encryption mechanism of the OLT and the decryption mechanism of the ONU. '378 at 3:9-13. In *Cosmokey Sols. GMBH v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021), the court held that a system that improved computer security while reducing overall complexity was a technical solution to a technical problem. *Id*. at 1099. The '378 Patent "improve[s] the security of the multicast service content" by limiting the range of users that receive the encryption key. '378 at 3:13-17. Finally, in

*SIPCO, LLC v. Emerson Elec. Co.*, 939 F.3d 1301 (Fed. Cir. 2019), the court held that a communication system that reduced unlawful interference was a technical solution to a technical problem. *Id*. at 1312-13. The '378 Patent describes one of its improvements as "it prevents illegal behaviors of the malicious users such as stealing the multicast service content, meanwhile, it does not affect the legal users normally using the encrypted multicast service after being activated." '378 at 3:23-26.

Much like with step one, Charter glosses over the meaningful inventive concepts added in the dependent claims. As discussed above, the dependent claims add inventive concepts to the independent claims, including encryption key regeneration after an aging time (claims 3 and 5), ONU application to receive multicast service data (claims 4, 6, and 8), and the OLT sending a bearer channel identification after successful activation (claims 4 and 8). All these limitations add meaningful functionality and address technical problems with PON systems.

### B.    Iarnach Pled Facts Showing Charter Willfully Infringes

Iarnach's second amended complaint pleads a compelling case for pre-suit willful infringement. And there can be no doubt that Iarnach properly alleges post-suit willfulness.

####    1.    Pre-Suit Willfulness

Iarnach pleaded facts showing that Charter knew about Iarnach's patents long before this lawsuit. SAC at ¶¶114-117. For example, in the late 2010s, Charter affirmatively cited the '035 Patent to the Patent Office and the '982 Patent was cited against it. SAC at ¶¶114-115. Charter also knew of these patents through its involvement with CableLabs, the organization that created the DPoE standards and of which both Charter and the original patent assignee (ZTE) were members. *Id.* at ¶¶117, 33. And after reviewing the asserted patents, Charter knew they read on DPoE v2.0 networks. *Id.* at ¶119. Yet Charter used the patented technology in its DPoE v2.0 networks anyways. *Id.* at ¶120. Accordingly, Charter's Motion fails as to pre-suit willfulness. *See*

*Alarm.Com Inc. v. Vivint, Inc.*, No. 2:23-CV-00004-JRG-RSP, 2023 U.S. Dist. LEXIS 174396, at *9 (E.D. Tex. Sep. 6, 2023) (denying motion to dismiss pre-suit willfulness where original patentee and defendant were competitors with a long relationship and overlapping technologies).

Charter claims it did not know about any of Iarnach's patents before this lawsuit. Mot. at 18-20. For the '035 Patent, Charter does not deny that it affirmatively cited that '035 Patent to the Patent Office while prosecuting its own patents; it instead claims this is legally insufficient. *Id.* at 19-20. Not so. "[T]his Court has consistently held [that] citation to the asserted patents by the defendant in prosecuting their own patents, along with other evidence, can create a genuine dispute of material fact as to the alleged infringer's actual knowledge of the asserted patents." *Correct Transmission, LLC v. Nokia of Am. Corp.*, No. 2:22-cv-00343-JRG-RSP, 2024 U.S. Dist. LEXIS 92770, at *10 (E.D. Tex. Mar. 21, 2024) (collecting cases).

For the '982 and '378 Patents, Charter does not deny it learned of them as part of its activities at CableLabs (*e.g.*, prosecuting patents and monitoring patent filings), but instead simply criticizes Iarnach's proof. Mot. at 18-19. However, Charter's patent knowledge can be established through circumstantial evidence, and Iarnach pled facts from which one can reasonably infer Charter knew of these patents: (1) Charter and ZTE (the prior assignee of the '982 and '378 Patents) were both members of CableLabs at the same time (*see* SAC at ¶117); (2) Charter and ZTE both developed the DPoE standards at CableLabs (*see id.* at ¶33-34, 117); (3) Charter and ZTE are competitors with respect to DPoE networks (*see id.* at ¶¶33, 36, 41-46); (4) DPoE networks are important to Charter's business since Charter has invested significant sums to create DPoE networks (*see id.* at ¶¶44-45); and (5) Charter and ZTE both file patents in the same DPoE space (*see id.* at ¶¶49, 69, 93, 114).

26

When all these facts are accepted as true and all reasonable inferences are drawn in Iarnach's favor, they support the notion that Charter learned of Iarnach's patents by monitoring the patent filings of CableLabs members and as part of prosecuting patents at CableLabs. It is unreasonable to demand direct proof of these activities before discovery has begun because "facts bearing on willfulness are likely to be, in large measure, in the possession of the defendant and available to the plaintiff only through discovery." *Alarm.Com*, 2023 U.S. Dist. LEXIS 174396, at *9. At most, Iarnach's pre-suit willfulness allegations should be dismissed without prejudice to refile based on discovery.

### 2.    Post-Suit Willfulness

"[T]his Court has repeatedly recognized [that] allegations that a defendant continues its allegedly infringing conduct even after receiving notice of a complaint are sufficient to at least state a claim for post-suit willful infringement." *Touchstream Techs., Inc. v. Altice USA, Inc.*, No. 2:23-cv-00060-JRG, 2024 U.S. Dist. LEXIS 45186, at *10-11 (E.D. Tex. Mar. 14, 2024) (collecting cases). Consistent with that legal doctrine, Iarnach pled that Charter willfully infringes because, after receiving the April 25, 2024 first amended complaint informing Charter that it infringed Iarnach's patents (and certainly after receiving the additional details found in the operative July 15, 2024 second amended complaint), Charter continues to make and use infringing DPoE v2.0 networks. SAC at ¶¶118-120. Accordingly, Iarnach properly pled a claim for post-suit willful infringement.

Charter argues the complaint fails to suitably allege post-suit willfulness because its purported "garden-variety patent infringement" is not sufficiently egregious. Mot. at 20. But "this Court has routinely rejected [Charter's] argument that a plaintiff must allege [] egregious behavior" to satisfy *Halo*. *Touchstream*, 2024 U.S. Dist. LEXIS 45186 at *11. Rather, "[u]nder *Halo*, the concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement."

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020).

"Accordingly, a plaintiff need not plead facts demonstrating egregious conduct to establish a claim for willful infringement at the 12(b)(6) stage." *NXP USA, Inc. v. Mediatek USA Inc.*, No. 2:21-CV-00318-JRG, 2022 U.S. Dist. LEXIS 45815, at *12-13 (E.D. Tex. Mar. 15, 2022).

**C.     To The Extent Necessary, Iarnach Should Be Granted Leave To Further Amend Its Complaint**

In the event the Court finds Iarnach has failed to satisfactorily plead a legal theory, Iarnach respectfully requests that the Court afford Iarnach the opportunity to cure any pleading deficiency before dismissing any part of the case. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case.").

**V.     CONCLUSION**

For at least the foregoing reasons, the Court should deny Charter's Motion in its entirety. But if the Court finds merit in any part of the Motion, Iarnach requests leave to replead.

Dated: August 20, 2024                    Respectfully submitted,

*/s/ Eric Enger*
Amir H. Alavi
Texas Bar No. 00793239
aalavi@aatriallaw.com
Demetrios Anaipakos
Texas Bar No. 00793258
danaipakos@aatriallaw.com
Michael McBride
Texas Bar No. 24065700
mmcbride@aatriallaw.com
ALAVI & ANAIPAKOS PLLC
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 751-2362
Facsimile: (713) 751-2341

Michael Heim
Texas Bar No. 09380923
mheim@hpcllp.com
Eric Enger
Texas Bar No. 24045833
eenger@hpcllp.com
R. Allan Bullwinkel
Texas Bar No. 24064327
abullwinkel@hpcllp.com
Alden Harris
Texas Bar No. 24083138
aharris@hpcllp.com
Blaine Larson
Texas Bar No. 24083360
blarson@hpcllp.com
Lily R. Glick
Texas State Bar No. 24131333
lglick@hpcllp.com
HEIM PAYNE & CHORUSH LLP
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Andrea L. Fair
Texas Bar No. 24078488
andrea@wsfirm.com
WARD, SMITH & HILL, PLLC
P.O. Box 1231
Longview, Texas 75606
Telephone: (903) 757-6400
Facsimile: (903) 757-2323

*Counsel for Plaintiff Iarnach Technologies Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was served to all counsel of record via CM/ECF.

*/s/ Eric Enger*
Eric Enger

29