**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| IARNACH TECHNOLOGIES LTD.,<br><br>*Plaintiff*,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS HOLDING COMPANY, LLC, CHARTER COMMUNICATIONS OPERATING, LLC, SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, and SPECTRUM GULF COAST, LLC,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 2:24-CV-00230-JRG |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiff Iarnach Technologies Ltd.'s ("Iarnach") and Defendants Charter Communications, Inc., Charter Communications Holding Company, LLC, Charter Communications Operating, LLC, Spectrum Management Holding Company, LLC, And Spectrum Gulf Coast, LLC's (collectively, "Charter") competing summary judgment motions which address whether or not Iarnach must grant Charter a royalty free license to the patents in suit. (Dkt. Nos. 143, 144.) Additionally, before the Court is Charter's motion to disqualify Iarnach's retained technical expert. (Dkt. No. 108.)

Having considered the associated briefing, the documents submitted in support thereof, and the parties' arguments at a hearing on these motions held on September 21, 2026, the Court finds that Iarnach's summary judgment motion should be **GRANTED** (Dkt. No. 143) and that Charter's summary judgment motion should be **DENIED** (Dkt. No. 144). Charter's motion to disqualify should also be **DENIED** (Dkt. No. 108).

These motions turn on whether ZTE Corporation (Iarnach's predecessor to the patents in suit) assigned to Iarnach the rights created in the First Agreement and Second Agreement discussed below. As an initial matter, the Court finds that there is no genuine dispute of material fact that ZTE Corporation never assigned or attempted to assign the rights in the First Agreement to Iarnach.

## I. BACKGROUND

Iarnach sued Charter in 2024, accusing it of infringing U.S. Patent Nos. 9,287,982 and 9,674,035 (the "patents in suit"). (Dkt. Nos. 43, 138.) Iarnach, however, is not the original owner of these two patents. It acquired them from the ZTE Corporation ("ZTE") in 2022.

Several years earlier in 2010, ZTE executed a license agreement ("**First Agreement**") in favor of Cable Television Laboratories, Inc. ("CableLabs") requiring ZTE to license its patents at "royalty free, no cost" rates (i.e., for free) as a part of a data services standard setting process. (Dkt. No. 144-2.) ZTE and CableLabs signed the First Agreement while these companies were working together on various Cable Data Services Specifications. (*Id.* at CL002240–41.) This First Agreement specified that ZTE "agree[d] to make licenses . . . available for . . . Essential Claims on a **royalty free, no cost terms** and conditions to any Third Party that desires to implement or has implemented any . . . Cable Data Services Specification." (*Id.* at CL002247 (emphasis added).) The First Agreement also impacted "future" patents that ZTE had not yet acquired. (*Id.* at CL002241.) The United States Patent and Trademark Office thereafter issued the asserted patents in 2016 and 2017.

In 2022, Iarnach purchased the patents in suit from ZTE via a Patent Purchase Agreement ("**Second Agreement**"). (Dkt. No. 144-5.) As a part thereof, ZTE represented that the asserted patents were being transferred to Iarnach "free and clear" of any "pledges, . . . standards' obligations or other encumbrances." (*Id.* at IARNACH_00002757.)

## II. LEGAL AUTHORITY

### A. Summary Judgment

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard provides that the mere existence of some alleged factual dispute will not defeat a properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it would affect the outcome of the case, and a dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party based on the evidence. *See, e.g.*, *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018).

### B. Patent Assignments

A patent owner may assign its ownership interests in a patent to an individual or company. 35 U.S.C. § 261. Such an assignment conventionally takes the form of a contract, and the Federal Circuit reviews contract interpretations under the law of the regional circuit. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006). Patent assignees take ownership of a patent "subject to the legal encumbrances thereon" because patent owners can only convey what they own. *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008).

### C. Expert Disqualification

Federal courts have the inherent power to disqualify experts, although such power is rarely used. *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996). The Fifth Circuit has adopted a two-step analysis for determining whether an expert or consultant should be disqualified:

(1) whether the opposing party had a confidential relationship with the expert; and

(2) whether the opposing party disclosed confidential or privileged information relevant to the instant case to the expert.

*See id.* The party seeking disqualification bears the burden of proving these elements, and only if both prongs are met should the expert be disqualified. *See id.*

## III. CHARTER'S MOTION THAT IARNACH IS BOUND BY THE ROYALTY FREE, NO COST LICENSING OBLIGATION OF ZTE, THE ORIGINAL ASSIGNEE OF THE ASSERTED PATENTS (DKT. NO. 144)

Charter argues that Iarnach must license the asserted patents to it on "royalty free, no cost" terms. Charter explains that the Second Agreement (a Patent Purchase Agreement) between ZTE and Iarnach (Dkt. No. 144-5) includes a choice of law clause applying German law. (Dkt. No. 144 at 5.) Under German law, Charter argues that ZTE's commitment in the First Agreement to provide a royalty free, no cost license was an "in rem" FRAND (Fair, Reasonable, and Non-Discriminatory) obligation that affixed to the asserted patents. (*Id.* at 6–9.) Charter argues that this obligation from the First Agreement followed the patents in suit to Iarnach when it acquired them from ZTE via the Second Agreement. (*Id.*) Charter also argues that such an application of German law is consistent with the U.S. patent law and that it should prevail under German or U.S. law. (Dkt. No. 144 at 9–11.)

Iarnach argues that the German law selection clause in the ZTE-Iarnach Second Agreement is irrelevant because Charter does "not bring a contract dispute" under that agreement. (Dkt. No. 148 at 3–4.) Even if German law governed the parties' dispute, it would require the Court to apply U.S. law to resolve the parties' dispute. (*Id.* at 4–6.) Iarnach argues that ZTE's obligation to grant royalty free, no cost licenses in the First Agreement neither burdened nor transferred with the patents in suit when Iarnach bought ZTE's patents via the Second Agreement. (*Id.* at 6–11.)

While the Court agrees with Charter that German law governs ZTE's assignment of the asserted patents to Iarnach via the Second Agreement, the Court analyzes this dispute under both German and U.S. law finding that, in either case, Iarnach should prevail.[1]

Charter relies principally on the FRAND analysis from Germany's *Unwired Planet v. Huawei*[2] decision, but such does not answer the dispositive question: whether ZTE's "royalty free, no cost" commitment passed to Iarnach automatically or had to be expressly assigned. Charter argues that *Unwired Planet v. Huawei*, which was decided by the Düsseldorf Higher Regional Court in 2019, determined that FRAND (Charter refers to FRAND and RAND interchangeably) commitments by a first patent owner always follow the patent to subsequent owners. (Dkt. No. 144 at 7 (citing Dkt. No. 145-5 ¶ 167 ("Because the FRAND commitment irrevocably . . . limits and defines the rights arising from the patent . . ., the patent can necessarily only be transferred to the acquirer in this limited form.")). However, the obligation to grant a royalty free license is not a FRAND commitment, which even upon favorable FRAND terms involves some licensing fee to be paid to the patent owner, not a free license.

*Unwired Planet v. Huawei* explained that a subsequent patent owner would still obtain a license fee if the prior owner made a FRAND commitment. (*See* Dkt. No. 145-5 ¶ 173 ("any license fee that must be paid for a standard-essential property right represents a cost factor"), ¶ 317 ("[T]he resulting license remuneration lead to a usage fee that is non-discriminatory and non-

---

[1] The Second Agreement (i.e., a Patent Purchase Agreement) unambiguously specifies that German law applies.

**9.6. GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of Germany, without reference to its conflicts of law principles.

Dkt. No. 144-5 § 9.6 (annotated).)

[2] Oberlandesgericht [OLGZ] [Higher Regional Court] Mar. 22, 2019, 1-2 U 31/16, juris (Ger.) [hereinafter, "*Unwired Planet v. Huawei*"].

exploitative towards the license seeker compared to others."), ¶ 318 ("[T]he SEP holder owes a . . . substantiated explanation of why the license fee charged by him . . . is FRAND, i.e., fair and reasonable.").) *Unwired Planet v. Huawei* did not hold that every contractual commitment to license a patent always and automatically attaches to the patent so as to bind subsequent owners in the patent's chain of title. Moreover, the dispute in that case focuses on the prior licensing practices of the prior patent owner, not a subsequent owner.

Such reasoning by Charter, at bottom, does not square with the "royalty free, no cost" license that it seeks. (*See* Dkt. No. 144-2 at CL002247.) Charter does not cite persuasive authority (German or U.S.) that a contractual free licensing commitment between discrete parties equals a FRAND obligation, or that a negotiated contract's option for a free license should be treated as a FRAND obligation. (*See* Dkt. No. 144-9 ¶¶ 18–20.)

To determine whether Iarnach is bound by ZTE's "royalty free, no cost" commitment absent an express assignment, the Court examines the exact agreements and pledges of the First Agreement.

The First Agreement specifies that ZTE's contractual obligation to grant "royalty free, no cost" licenses could only be passed on to Iarnach if the First Agreement itself was expressly assigned to Iarnach. (*See* Dkt. No. 144-2.) Section 3.2 of the First Agreement includes the disputed "royalty free, no cost" language.

> **3.2 Availability of License to Essential Claims.** With respect to all Essential Claims of all patents or published patent applications owned or controlled by Participant or any of its Affiliates which are *not* validly noticed to CableLabs (or its designee) by Participant in accordance with the procedure set forth in Section 3.1 above, Participant agrees to make licenses, or cause licenses to be made, available for such Essential Claims on a royalty free, no cost terms and conditions to any Third Party that desires to implement or has implemented any Issued CableLabs Cable Data Services Specification. Such license may be limited to products, services or other such implementations that comply with the relevant portion of the Issued CableLabs Cable Data Services Specification.

(*Id.* at CL002247.) ZTE, as the "Participant," agreed to this provision. (*Id.* at CL002240–42.)

The First Agreement, however, also expresses that ZTE's "royalty free, no cost" obligation could only be assigned to a "successor" if the reassigning party (here ZTE) first obtained the other Party's (CableLab's) express consent. (*Id.* at CL002244.)

> 9.3 **Assignment.** This Agreement may be assigned or transferred by either Party to any successor by merger, purchaser or other transferee of all or substantially all of its business or that portion of its business to which this Agreement relates, or other form of corporate reorganization. Except as set forth above, neither Party may assign any rights or delegate any duties under this Agreement in whole or in part without the other Party's prior written consent (such consent not to be unreasonably withheld), and any such attempted assignment shall be void and of no effect. This Agreement shall be binding upon and inure to the benefit of each of the Parties, their successors, and permitted assigns.

(*Id.*) Such a clear provision is distinguishable from usual FRAND provisions found in other standards agreements that bind successors-in-interest by design. (*See, e.g.*, Dkt. No. 160-2 at 3 ("FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest.").)

Iarnach did not <u>inherit</u> ZTE's "royalty free, no cost" commitment. In other words, this provision did not automatically encumber the title to the patents in suit because ZTE never assigned that specific contractual obligation to Iarnach. ZTE's licensing obligation under Section 3.2 could only be transferred to a subsequent patent owner if that provision of the First Agreement was properly assigned to the subsequent patent owner in compliance with Section 9.3. (Dkt. No. 144-2 at CL002244.) CableLabs's "written consent" is required to convey this obligation to anyone beyond ZTE. (*Id.*) Any attempt to assign such rights without such consent would "be void and of no effect." (*Id.*) Importantly, the parties do not dispute that ZTE never assigned or attempted to assign the First Agreement to Iarnach. (*See* Dkt. No. 143 ¶ 5 ("CableLabs did not receive a request for written consent from ZTE to assign the ZTE-CableLabs Agreement to Iarnach."); Dkt. No. 149 at 1 (representing that Charter does not dispute this fact).)

Since there is no material dispute of fact that ZTE never assigned the "royalty free, no cost" contractual commitment to Iarnach and since ZTE's commitment did not automatically encumber

the asserted patents, the Court finds that Charter's motion for summary judgment should be **DENIED**. The Court disagrees with Charter's contention that the assignment provision of the First Agreement is irrelevant. The Court finds it to be controlling. (*See* Dkt. No. 144 at 11–12.)

Applying U.S. law to determine the legal consequences of the ZTE-Iarnach assignment leads the Court to reach the same conclusion. Charter cites cases focused on the specific terms of disputed obligations when applying U.S. law. *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1276 (Fed. Cir. 2009) ("The language of the TransCore—Mark IV settlement agreement is unambiguous."); *Innovus Prime, LLC v. Panasonic Corp.*, No. C-12-00660-RMW, 2013 WL 3354390, at *3, *6–*8 (N.D. Cal. July 2, 2013) (analyzing specific licensing language when applying "United States federal law"). Those cases explained what happened when an encumbrance to a patent existed; they do not establish that the First Agreement creates an encumbrance in the first instance. Analyzing the specific terms of the First Agreement and consequences of the patent assignment under U.S. law requires the same conclusion, i.e., that ZTE never assigned the free licensing obligation to Iarnach.

Charter's last argument is that U.S. patent law supports the premise that "one cannot convey what one does not own." *TransCore*, 563 F.3d at 1275; *see also Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) ("[B]ecause the owner of a patent cannot transfer an interest greater than that which it possesses, an assignee takes a patent subject to the legal encumbrances thereon."). Although the Court agrees with this general principle, that principle is not at issue. Rather, the applicable language of the First and Second Agreements are at issue.

The Court notes that this fact-specific case is not a FRAND case involving SEP patents, which might have entailed a different analysis. Here, the fact that Charter *could* have been entitled

to receive a free license to the asserted patents if and when ZTE had assigned such obligation does not change these specific facts. *See Daingean Techs. Ltd. v. T-Mobile USA, Inc.*, Case No. 2:23-cv-00347-JRG-RSP, Dkt. No. 386, at *5 (E.D. Tex. May 13, 2025) ("Nokia *could* have taken a license to the '803 Patent (which would have encumbered it, including as to Daingean) up until Mitsubishi assigned, *inter alia*, all licensing rights to Daingean.").

In sum, the Court finds that the assignment requirements of the First Agreement are unambiguous and prevent the automatic conveyance of the royalty free provision without an express assignment consented to in advance by CableLabs. Such provision never transferred to Iarnach via the Second Agreement or otherwise. This precludes the relief which Charter seeks.

## IV. IARNACH'S MOTION THAT CHARTER IS NOT LICENSED UNDER THE ZTE-CABLELABS AGREEMENT (DKT. NO. 143)

Iarnach's motion for summary judgment that Charter does not have and is not entitled under these facts to a royalty free, no cost license (Dkt. No. 143) runs directly opposite Charter's motion (Dkt. No. 144), which asks the Court to find that Iarnach is bound by the royalty free, no cost licensing obligation of ZTE. Consistent with the above analysis denying Charter's summary judgment motion, the Court finds that Iarnach's motion should be **GRANTED**. There is no genuine dispute of fact that ZTE never obtained consent to assign or attempted to assign the ZTE-CableLabs agreement to Iarnach. This is confirmed by ZTE's representation in the Second Agreement that the patents in suit are transferred free and clear of any prior obligation. (Dkt. No. 144-5 at IARNACH_00002757.) As a result, Iarnach's motion for summary judgment should be granted.

## V. CHARTER'S MOTION TO DISQUALIFY LANE JOHNSON FROM SERVING AS IARNACH'S TECHNICAL EXPERT PREVENTING HIM FROM ACCESSING CHARTER'S CONFIDENTIAL INFORMATION (DKT. NO. 108)

Also before the Court and addressed in oral argument is Charter's motion to disqualify Iarnach's expert Lane Johnson. (Dkt. No. 108.) On March 2, 2025, Iarnach disclosed to the Charter that it intended to use Lane Johnson as an "expert consultant" in this case. However, from 1998 until 2023, Mr. Johnson undertook several consulting positions for Charter. Among other roles, Mr. Johnson was hired by Charter in August 2014 to design and manage a new laboratory called the Charter Technology & Engineering Center. There Mr. Johnson's task was to ensure that the testing teams had the resources they needed to run their tests. Mr. Johnson also spent 13 years at CableLabs, the organization in charge of developing and maintaining 'Data over Cable Service Interface Specification Provisioning of Ethernet Passive Optical Networks' ("DPoE") specifications.

Charter contends that Mr. Johnson was Charter's employee for over a decade and maintained a confidential relationship with Charter. (Dkt. No. 108 at 4.) When the asserted patents issued, Mr. Johnson was working at Charter's Advanced Engineering Labs designing, integrating, and testing a laboratory network representing the end-to-end capabilities of Charter's deployed network, including the DOCSIS back-office equipment and OLT and ONU devices. (*Id.* at 5–6.) Charter says this is problematic because Iarnach has identified "optical line terminals (OLTs), optical network units (ONUs)" and "DOCSIS back office equipment" as the accused instrumentalities. (*Id.*) Charter argues that over the course of his over-a-decade-long working relationship with Charter, Mr. Johnson was required to learn and use confidential information about Charter's technology. (*Id.*)

Iarnach responds that Mr. Johnson has sworn that while he was at Charter's CTEC lab, any DPoE-related tests were performed in a different lab at a different location which Mr. Johnson

could not access. (Dkt. No. 113 at 7–8.) Mr. Johnson apparently did not test any DPoE network equipment at CTEC, including OLTs or ONUs. (*Id.*) In addition, Mr. Johnson was not part of internal meetings discussing future business strategies or the development of new DPoE techniques. (*Id.* at 8.) Iarnach disputes that Mr. Johnson had access to a confidential document repository or that Mr. Johnson obtained Charter's privileged information. (*Id.* at 8.)

Charter has not established that it disclosed confidential or privileged information relevant to the instant case to Mr. Johnson that would warrant disqualification. To the extent Charter has previously disclosed information to Mr. Johnson, the Court finds that such information was limited to technical information regarding how various standards and products operated, rather than confidential and strategic information that would warrant exclusion. *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178, 1182 (5th Cir. 1996) ("[P]urely technical information is not confidential."). The Court finds that Charter's disqualification motion should be **DENIED**.

Notwithstanding such denial, Charter may seek an appropriate motion *in limine* that addresses Mr. Johnson's prior employment with Charter at the appropriate time.

## VI. CONCLUSION

For the reasons explained above, Iarnach's motion (Dkt. No. 143) is **GRANTED** and Charter's motions (Dkt. Nos. 108, 144) are **DENIED**. Given the stay that existed while these issues were addressed, the Court **ORDERS** that within seven (7) days of this Order, the parties shall file a jointly proposed Docket Control Order for the Court's consideration and action.

**So ORDERED and SIGNED this 13th day of November, 2026.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE